Opinion
 

 MASTERSON, J.
 

 In 1967, the California Legislature enacted the Humane Slaughter Law (HSL), which governs the methods by which certain animals
 
 *499
 
 can be slaughtered. (Stats. 1967, ch. 1381, § 1, pp. 3240-3241, codified as Food & Agr. Code, §§ 19501-19503.) In 1991, the Legislature amended the law to include poultry and authorized the Department of Food and Agriculture to issue regulations concerning the slaughter of poultry. (Stats. 1991, ch. 837, §§ 1-2, pp. 3716-3717, amending Food & Agr. Code, § 19501 and adding Food & Agr. Code, § 19501.5.)
 

 In its regulations, the department approved several specific methods for slaughtering poultry, including methods for “ritualistic slaughter.” (Cal. Code Regs., tit. 3, §§ 1245.4, 1245.16.) The regulations also authorize the chief of the department’s meat and poultry inspection branch to approve other methods of ritualistic slaughter.
 
 (Id.,
 
 § 1245.16, subd. (b), formerly subd. (c).)
 

 Farm Sanctuary, Inc., a nonprofit organization that promotes the humane treatment of farm animals, filed this declaratory relief action, alleging that the ritualistic slaughter regulation authorizes the inhumane slaughtering of poultry and is therefore inconsistent with the HSL. The trial court found the regulation to be consistent with the HSL and entered judgment for the department. We affirm.
 

 Background
 

 In its present form, Food and Agricultural Code section 19501, part of the HSL, provides that “[a]ll cattle, calves, horses, mules, sheep, swine, goats, or poultry shall be slaughtered by either of the following prescribed methods; [¶] (a) The animal shall be rendered insensible to pain by a captive bolt, gunshot, electrical or chemical means, or any other means that is rapid and effective before being cut, shackled, hoisted, thrown, or cast, with the exception of poultry which may be shackled. [¶] (b) The animal shall be handled, prepared for slaughter, and slaughtered in accordance with ritual requirements of the Jewish or any other religious faith that prescribes a method of slaughter whereby the animal suffers loss of consciousness by anemia of the brain caused by the simultaneous and instantaneous severance of the carotid arteries with a sharp instrument. [¶] This section does not apply to the slaughter of spent hens and small game birds . . . .” (Food & Agr. Code, § 19501.)
 

 The HSL states that “the department [of food and agriculture] may designate other methods [of slaughter] not specifically described in Section 19501.” (Food & Agr. Code, § 19503.) The Legislature authorized the department to adopt regulations to implement the HSL.
 
 (Id.,
 
 §§ 19501.5, subd. (a), 19502, 19503.)
 

 
 *500
 
 With respect to poultry, the department’s regulations provide that “[a]ll slaughter of poultry, with the exception of ‘Spent hens’ and ‘Small game birds,’ shall be performed in accordance with approved methods of humane poultry slaughter as provided in this article.” (Cal. Code Regs., tit. 3, § 1245.1.)
 
 [1]
 
 Section 1245.4, entitled “Method of Humane Slaughter of Poultry,” states: “(a) The Department has determined that the following methods are acceptable and practical humane methods for use in the stunning and slaughter of poultry, [¶] (1) Carbon dioxide and argon gas-induced anoxia, [¶] (2) Electrical stunning, [¶] (3) Electrocution to cardiac arrest, [¶] (4) Captive bolt (ostrich and rabbit only), [¶] (5) Cervical dislocation, [¶] (6) Carotid artery severance, [¶] (7) Decapitation, [¶] (8) Other methods as approved by the Department, [¶] (b) Any of the above methods may be used in combination to effect the most humane slaughter of poultry. . . .” Other sections of the regulations discuss the seven approved methods of slaughter in more detail (§§ 1245.6-1245.13).
 

 As originally adopted, section 1245.16, entitled “Ritualistic Slaughter,” provided: “(a) Where a method of slaughter is prescribed by Kosher or other rules of the Jewish faith, Islamic and other faiths and causes the poultry to lose consciousness through anemia of the brain resulting from the simultaneous severance of both carotid arteries with a sharp instrument, it shall be considered a humane method of slaughter, [¶] (b) Confucian exemption may be requested by the clerical official or the responsible leader of the Chinese Benevolent Association, [¶] (c) Exemptions for other methods of ritualistic slaughter of poultry may be obtained upon approval by the Chief, Meat and Poultry Inspection Branch while effectuating the purpose of these regulations.” (Cal. Reg. Notice Register 94, No. 41 (Oct. 14, 1994).)
 
 [2]
 

 In May 1996, Farm Sanctuary filed this action for declaratory and injunctive relief, alleging that subdivisions (b) and (c) of section 1245.16 permit the inhumane slaughter of poultry and are therefore in conflict with the HSL.
 
 [3]
 
 Farm Sanctuary sought a declaration that those portions of the
 
 *501
 
 regulations are invalid and prayed for an injunction preventing the department from granting any exemptions under
 
 [4]
 

 In October 1996, Farm Sanctuary filed a motion for summary judgment. The department opposed the motion on the ground that the ritualistic slaughter regulation is authorized by and consistent with the HSL. By order dated February 14, 1997, the trial court denied the motion, finding the regulation to be valid. Based on the trial court’s ruling, the parties stipulated to judgment in favor of the department. The trial court entered judgment as requested. Farm Sanctuary filed a timely appeal from the judgment.
 

 Discussion
 

 The question on appeal requires that we interpret the HSL and the department’s regulations. The interpretation of statutes and administrative regulations presents a question of law, which is subject to independent review on appeal.
 
 (Home Depot, U.S.A., Inc.
 
 v..
 
 Contractors’ State License Bd.
 
 (1996) 41 Cal.App.4th 1592, 1599 [49 Cal.Rptr.2d 302].)
 

 Farm Sanctuary argues that the department’s regulation exempting certain forms of ritualistic slaughter is invalid because it is contrary to the HSL. Farm Sanctuary correctly states that the HSL does not authorize the department to grant any exemptions that would result in the inhumane slaughter of poultry. Farm Sanctuary contends that subdivisions (b) and (c) of section 1245.16 authorize such exemptions.
 

 (see fn. 5.) The department counters that the case is not ripe for- adjudication and that, in any event, the ritualistic slaughter regulation is valid.
 
 [5]
 
 We conclude that the case presents a justiciable controversy and that the regulation is valid.
 

 A.
 
 Ripeness
 

 “The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. . . . It is rooted in
 
 *502
 
 the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy.”
 
 (Pacific Legal Foundation
 
 v.
 
 California Coastal Com.
 
 (1982) 33 Cal.3d 158, 170 [188 Cal.Rptr. 104, 655 P.2d 306], citation omitted
 
 (Pacific Legal Foundation).)
 

 In determining whether a controversy is ripe, we use a two-pronged test: (1) whether the dispute is sufficiently concrete to make declaratory relief appropriate; and (2) whether the withholding of judicial consideration will result in a hardship to the parties.
 
 (Pacific Legal Foundation, supra,
 
 33 Cal.3d at pp. 171-173.) Under the first prong, the courts will decline to adjudicate a dispute if “the abstract posture of [the] proceeding makes it difficult to evaluate ... the issues”
 
 (id.
 
 at p. 172), if the court is asked to speculate on the resolution of hypothetical situations
 
 (ibid.),
 
 or if the case presents a “contrived inquiry”
 
 (ibid.).
 
 Under the second prong, the courts will not intervene merely to settle a difference of opinion; there must be an imminent and significant hardship inherent in further delay.
 
 (Id.
 
 at pp. 172-173.)
 

 In this case, the ripeness test is satisfied. As to the first prong, the question before us is not so abstract or hypothetical that we should await a better factual scenario. Farm Sanctuary contends that the ritualistic slaughter regulation is invalid
 
 on its face
 
 because it is inconsistent with the HSL. “[T]he issue tendered is a purely legal one: whether the statute was properly construed by the [department] . . . .”
 
 (Abbott Laboratories
 
 v.
 
 Gardner
 
 (1967) 387 U.S. 136, 149 [87 S.Ct. 1507,1515, 18 L.Ed.2d 681], followed in
 
 Pacific Legal Foundation, supra,
 
 33 Cal.3d at pp. 171-173.) In addition, “[t]he regulation challenged here, promulgated in a formal manner after announcement . . . and [after] consideration of comments by interested parties[,] is quite clearly definitive[, i.e., final].”
 
 (Abbott Laboratories
 
 v.
 
 Gardner, supra,
 
 387 U.S. at p. 151 [87 S.Ct. at p. 1517], fn. omitted.)
 

 As to the second prong, a significant and imminent injury is inherent in further delay. If, as Farm Sanctuary contends, the ritualistic slaughter regulation authorizes a wholesale exemption from the HSL, poultry may be slaughtered through
 
 inhumane
 
 methods. By delaying a decision on the merits, we run the risk of allowing the needless suffering of animals—the evil that the HSL was intended to prevent.
 

 
 *503
 
 We realize that Farm Sanctuary and its members might not face any hardship if we decline to reach the merits of the case. The HSL was enacted for the benefit of
 
 animals.
 
 If the ritualistic slaughter regulation is invalid, it will result in an unlawful injury to poultry, not humans. In essence, the affected animals in this case are the real parties in interest. In these unique circumstances, we should focus on the potential harm to the beneficiaries of the statute.
 

 Further, as a practical matter, Farm Sanctuary should be allowed to challenge the ritualistic slaughter regulation. Assuming that the regulation authorizes an exemption from the HSL’s humane slaughter requirement, someone who is granted an exemption is not about to challenge the regulation. By the same token, someone who is denied an exemption might seek to overturn the denial but would not attack the regulation’s creation of an exemption. Thus, utiless an organization like Farm Sanctuary is permitted to challenge the department’s rulemaking authority, the ritualistic slaughter regulation will be immune from judicial review. (See
 
 Bd. of Soc. Welfare
 
 v.
 
 County of LA.
 
 (1945) 27 Cal.2d 98, 100 [162 P.2d 627] [state board could pursue litigation on behalf of individuals who were not financially or physically able to seek relief];
 
 Driving Sch. Assn, of Cal.
 
 v.
 
 San Mateo Union High Sch. Dist.
 
 (1992) 11 Cal.App.4th 1513, 1519 [14 Cal.Rptr.2d 908] [association had standing to seek relief for third persons, in part because lack of standing would prevent judicial review of challenged conduct];
 
 California Water & Telephone Co.
 
 v.
 
 County of Los Angeles
 
 (1967) 253 Cal.App.2d 16, 24 [61 Cal.Rptr. 618] [declaratory relief action may raise justiciable issue if other means of testing validity of government’s decision are not available].) As one court has observed: “Where [a statute] is expressly motivated by considerations of humaneness toward animals, who are uniquely incapable of defending their own interests in court, it strikes us as eminently logical to allow groups specifically concerned with animal welfare to invoke the aid of the courts in enforcing the statute.”
 
 (Animal Welfare Institute
 
 v.
 
 Kreps
 
 (D.C. Cir. 1977) 561 F.2d 1002, 1007 [183 App.D.C. 109] [dictum].)
 
 [6]
 

 Moreover, declaratory relief is appropriate where “questions of public interest... are involved.”
 
 (Colliery. Lindley
 
 (1928) 203 Cal. 641, 645 [266
 
 *504
 
 P. 526]; accord,
 
 Pacific Legal Foundation, supra,
 
 33 Cal.3d at p. 170 [ripeness doctrine “should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question”];
 
 Gillette
 
 v.
 
 Gillette
 
 (1932) 122 Cal.App. 640, 644-645 [10 P.2d 760] [demurrers to declaratory relief action properly sustained, in part because litigation did not involve issue of public interest]; see also
 
 Environmental Protection Information Center
 
 v.
 
 Department of Forestry & Fire Protection
 
 (1996) 43 Cal.App.4th 1011, 1019-1020 [50 Cal.Rptr.2d 892] [nonprofit environmental organization could challenge administrative regulation that effectively precluded it from monitoring compliance with enabling statute].)
 

 We think it clear that the slaughtering of animals through humane methods, as required by the HSL, is a matter of public importance. “It has long been the public policy of this country to avoid unnecessary cruelty to animals.”
 
 (Humane Soc. of Rochester & Monroe Cty.
 
 v.
 
 Lyng
 
 (W.D.N.Y. 1980) 633 F.Supp. 480, 486.) “[T]here is a social norm that strongly proscribes the infliction of any ‘unnecessary’ pain on animals, and imposes an obligation on all humans to treat nonhumans ‘humanely.’ ” (Francione,
 
 Animals, Property and Legal Welfarism: “Unnecessary” Suffering and the “Humane” Treatment of Animals
 
 (1994) 46 Rutgers L.Rev. 721, 722; see also Note,
 
 The Inadequate Protection of Animals Against Cruel Animal Husbandry Practices Under United States Law
 
 (1995) 17 Whittier L.Rev. 145, 155-168 [discussing history of animal protection laws].)
 

 In sum, “. . . the public interest requires that there be an adjudication to settle the [statutory] question here presented. . . . Were there any doubt about the justiciability of the controversy, that doubt would be resolved in favor of present adjudication, because the public is interested in the settlement of the dispute.”
 
 {California Water & Telephone Co.
 
 v.
 
 County of Los Angeles, supra,
 
 253 Cal.App.2d at p. 26.)
 
 [7]
 

 
 *505
 
 B.
 
 Validity of the Regulation
 

 Farm Sanctuary argues that, because the ritualistic slaughter regulation permits the inhumane killing of poultry, it is in conflict with, and thus invalid under, the HSL. Of course, “[w]henever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute . . . .” (Gov. Code, § 11342.2.) “[Administrative regulations which exceed the scope of the enabling statute are invalid and have no force or life.”
 
 (Woods
 
 v.
 
 Superior Court
 
 (1981) 28 Cal.3d 668, 680 [170 Cal.Rptr. 484, 620 P.2d 1032].)
 

 As for our standard of review, “ ‘[t]he contemporaneous administrative construction of a statute by an administrative agency charged with its enforcement and interpretation is entitled to great weight unless it is clearly erroneous or unauthorized.’ . . . [¶] However, ... the applicable principle changes a great deal when what is involved is a challenge to the very authority of the agency to even issue the challenged regulation . . . . ‘[T]he rulemaking authority of an agency is circumscribed by the substantive provisions of the law governing the agency. . . . Thus, the first task of the reviewing court is to decide that the agency reasonably interpreted its legislative mandate^] as regulations that alter or amend the statute or enlarge or impair its scope are void. . . . This standard of review is one of respectful nondeference. . . .’”
 
 (Environmental Protection Information Center
 
 v.
 
 Department of Forestry & Fire Protection, supra,
 
 43 Cal.App.4th at pp. 1021-1022, citations and italics omitted.)
 

 Statutes and administrative regulations are governed by the same rules of construction.
 
 (Industrial Indemnity Co.
 
 v.
 
 City and County of San Francisco
 
 (1990) 218 Cal.App.3d 999, 1008 [267 Cal.Rptr. 445].) In construing a statute, “we strive to ascertain and effectuate the Legislature’s intent. ... ‘In undertaking this determination, we are mindful of this court’s limited role in the process of interpreting enactments from the political branches of our state government. In interpreting statutes, we follow the Legislature’s intent, as exhibited by the plain meaning of the actual words of the law .... We give the words of the statute ‘ “their usual and ordinary meaning.” ’ . . . ‘ “Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent
 
 *506
 
 possible.” ‘If there is no ambiguity in the language of the statute, “then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.” ’ ”
 
 (People
 
 v.
 
 Loeun
 
 (1997) 17 Cal.4th 1, 8-9 [69 Cal.Rptr.2d 776, 947 P.2d 1313], citations omitted.)
 

 In general, “ ‘ “[t]he meaning of a statute may not be determined from a single word or sentence .... Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.” ’ ”
 
 (Peltier
 
 v.
 
 McCloud River R.R. Co.
 
 (1995) 34 Cal.App.4th 1809, 1816 [41 Cal.Rptr.2d 182].)
 

 1.
 
 Confucian Exemption
 

 As stated, the ritualistic slaughter regulation, as originally adopted, provided that “Confucian exemption may be requested by the clerical official or the responsible leader of the Chinese Benevolent Association.” (§ 1245.16, subd. (b).) Farm Sanctuary attacks this portion of the regulation on the ground that the HSL does not authorize the department to “exempt” anyone or any practice from the humane slaughter requirement. This argument fails for two reasons.
 

 First, the Confucian exemption concerns the
 
 postmortem
 
 treatment of poultry. The exemption permits the viscera (intestines, liver, etc.) to remain in the poultry carcass
 
 after
 
 the animal has been slaughtered. Because this exemption does not allow the inhumane slaughter of poultry, it is not inconsistent with the HSL.
 

 Second, as of January 8, 1998, the department repealed the Confucian exemption, such that it is no longer part of the humane slaughter regulations. (Cal. Reg. Notice Register 98, No. 2 (Jan. 9, 1998).)
 
 [8]
 
 Farm Sanctuary’s challenge to this portion of the ritualistic slaughter regulation is therefore moot. (See
 
 Boccato
 
 v.
 
 City of Hermosa Beach
 
 (1984) 158 Cal.App.3d 804, 808 [204 Cal.Rptr. 727] [“A question may be deemed moot when, although it initially presented an existing controversy, the passage of time or the acts of the parties or a court decision have deprived the controversy of its life.”].)
 

 2.
 
 Other Exemptions for Ritualistic Slaughter
 

 Farm Sanctuary’s principal attack is on subdivision (c) of section 1245.16, which authorizes the chief of the department’s meat and poultry inspection
 
 *507
 
 branch to approve “[e]xemptions for other methods of ritualistic slaughter of poultry . . . while effectuating the purpose of these regulations.” In particular, Farm Sanctuary interprets the regulation to mean that the chief may approve
 
 inhumane
 
 methods of slaughter. We reject this interpretation.
 

 We begin our analysis with the enabling legislation, the HSL. That law identifies two general methods of humane slaughter. (1) rendering an animal insensible to pain (e.g., use of captive bolt, chemicals, etc.); and (2) rendering an animal unconscious by instantaneously severing the carotid arteries with a sharp instrument. (Food & Agr. Code, § 19501.) The HSL states that those methods are not exclusive; the department is expressly authorized to promulgate regulations “designat[ing] other methods [of slaughter] not specifically described in [the HSL].”
 
 (Id.,
 
 § 19503; see
 
 id.,
 
 § 19501.5.)
 

 In accordance with that mandate, the department has adopted regulations which list and describe seven methods of humane slaughter. (§§ 1245.4, 1245.6-1245.13.) In addition to those specified methods, the regulations include “[o]ther methods as approved by the Department.” (§ 1245.4, subd. (a)(8).) Similarly, the challenged regulation provides that “[e]xemptions for other methods of ritualistic slaughter” may be approved “while effectuating the purpose of these regulations.” (§ 1245.16, subd. (c).)
 

 In construing the ritualistic slaughter regulation, Farm Sanctuary seizes on the word “exemptions,” arguing that the chief of the inspection branch is authorized to approve methods of slaughter exempt from the HSL, i.e., methods that are inhumane. We find that this interpretation improperly focuses on one word and ignores the context of the regulation.
 

 “Exemption” is defined as “freedom from any charge or obligation to which others are subject.” (Webster’s Third New Intemat. Diet. (1993) p. 795, col. 2.) However, the department’s use of the word “exemptions” does not conflict with the HSL’s requirement that
 
 all
 
 methods of slaughter be humane. Farm Sanctuary’s emphasis on the word “exemptions” overlooks the language at the end of the regulation—“while effectuating the purpose of these regulations.” This concluding language makes clear that any “exemption” must further the goal of the regulations—that
 
 “[a]ll
 
 slaughter of poultry ... be performed in accordance with approved methods of
 
 humane
 
 poultry slaughter . . . .” (§ 1245.1, italics added.)
 

 The ritualistic slaughter regulation, when read in conjunction with the HSL and the regulations as a whole, is consistent with the spirit and letter of the law. The HSL authorizes the department to approve methods of slaughter that are not specifically mentioned in the statute. The regulations, in turn, list
 
 *508
 
 seven approved methods. of humane slaughter but also indicate that the department may approve other methods. (§ 1245.4, subd. (a).) The challenged regulation (§ 1245.16, subd. (c))-continues this theme by allowing the chief of the inspection branch to approve “other methods” of ritualistic slaughter that are humane. Read in context, the word “exemptions” does not mean “exemptions from the HSL” or “exemptions from humane slaughter.” Rather, it refers to an exemption from
 
 the list of specific methods of slaughter already approved by the department
 
 (§ 1245.4, subd. (a)). Put another way, the use of the word “exemptions” simply reflects that the, chief of the inspection branch can approve
 
 additional
 
 methods of ritualistic slaughter that are
 
 humane.
 

 This conclusion finds support in the history of the ritualistic slaughter regulation. In a “Final Statement of Reasons,” explaining the adoption of the poultry regulations, the department reported:
 

 “The initial statement of reasons indicated that the Department shall adopt and implement regulations to regulate the slaughter of poultry in a humane manner. As a result of information and comments received during the public comment period and at the public hearing the Department is proposing to do the following: (1) add a ritualistic slaughter exemption . . . . [¶] The ritualistic slaughter of poultry exemption is being proposed after the United States Department of Agriculture’s Directives and Regulations permitting ritualistic slaughter of poultry as in Moslem and Islamic faiths.[
 
 9
 
 ] The intent of this proposal is to allow individuals the right to exercise their freedom of religion.
 
 All religious exemptions must comply with minimum humane slaughter procedures for approval.
 

 “Many comments were received as to ‘ritualistic slaughter’ exemptions. Many felt there should be no exemptions. However, there are people who feel and believe differently. The Supreme Court of the United States has ruled repeatedly for the right to freely exercise one’s religion. Legal advice to the Department was that a section on ritualistic slaughter exemptions be included. That notwithstanding,
 
 any exemption in order to be approved must meet minimum humane standards.
 
 [¶] • • • [¶] • • • Such ritualistic slaughter
 
 *509
 
 methods that may be approved and exempted shall be closely observed and monitored
 
 for
 
 humaneness.” (Dept, of Food and Agriculture, Final Statement of Reasons: Submission of Proposed Regulations Relating to Humane Slaughter of Poultry (1994) pp. 1-48, italics added.)
 

 In conclusion, the ritualistic slaughter regulation does not authorize the approval of inhumane methods of killing poultry. Because the regulation requires that “[e]xemptions for other methods of ritualistic slaughter” be humane, it is consistent with the HSL. Accordingly, the trial court properly denied summary judgment for Farm Sanctuary and, based upon the parties’ stipulation, entered judgment in favor of the department.
 

 Disposition
 

 The judgment is affirmed.
 

 Vogel (Miriam A.), Acting P. J., and Dunn, J.,
 
 *
 
 concurred.
 

 [1]
 

 All further section references are to title 3 of the California Code of Regulations unless otherwise indicated.
 

 [2]
 

 Effective January 8, 1998, subdivision (b) of section 1245.16, concerning the Confucian exemption, was repealed, and subdivision (c) was relettered as subdivision (b). (Cal. Reg. Notice Register 98, No. 2 (Jan. 9, 1998).) For convenience, we will refer to the subdivisions as they existed in the original regulation.
 

 [3]
 

 Farm Sanctuary, Inc., a Delaware corporation, is a nonprofit organization with approximately 40,000 members worldwide, including members who live in California. It opposes the inhumane treatment of poultry and other farm animals and is dedicated to ending the use of animals for food production. The organization engages in efforts to investigate and monitor compliance with laws that prevent the inhumane treatment of animals. Through various
 
 *501
 
 programs and publications, Farm Sanctuary strives to educate the public about the inhumane treatment of animals.
 

 [4]
 

 Pursuant to Government Code section 11350, subdivision (a), “[a]ny interested person may obtain a judicial declaration as to the validity of any regulation by bringing an action for declaratory relief in the superior court . . . .” The department does not dispute that Farm Sanctuary is an “interested person” within the meaning of this statute.
 

 [5]
 

 The department did not raise the issue of ripeness in the trial court. Nevertheless, the issue is one of law and can be raised for the first time on appeal. (See
 
 Hale
 
 v.
 
 Morgan
 
 (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512].)
 

 [6]
 

 Nor is the dispute here rendered nonjusticiable or less ripe by the fact that the plaintiff is an organization rather than an individual. “The participation of incorporated and unincorporated associations . . . has become common and accepted in public interest-oriented litigation and activities. ... Of late courts have noted a ‘marked accommodation of formerly strict procedural requirements of standing . . . where matters relating to the “social and economic realities of the present-day organizations of society”. . . are concerned’ and a corresponding ‘relaxation of former, more rigid standing requirements in order to permit an assertion of a “public” cause of action.’ . . . ‘[Associations] are thus pursuing more than privately held rights, and are asserting more than privately held grievances: they are acting as members of the public and in the public interest.’ ”
 
 (McKeon
 
 v.
 
 Hastings College
 
 (1986) 185 Cal.App.3d 877, 892-893 [230 Cal.Rptr. 176], citations omitted.)
 

 [7]
 

 In
 
 Bd. of Soc. Welfare
 
 v.
 
 County of L.A., supra,
 
 27 Cal.2d 98, the court relaxed the requirements for seeking a writ of mandate, stating that a petitioner need not show that he has any legal or special interest in a writ proceeding brought to enforce a public right or duty.
 
 (Id,
 
 at pp. 100-101.) Although this “public interest” exception was severely restricted in
 
 Parker
 
 v.
 
 Bowron
 
 (1953) 40 Cal.2d 344, 354 [254 P.2d 6], later Supreme Court decisions repudiated
 
 Parker
 
 and approved the “public interest” exception. (See
 
 International Union of United Auto, etc. Workers
 
 v.
 
 Department of Human Resources Dev.
 
 (1976) 58 Cal.App.3d 924, 933-935 [130 Cal.Rptr. 368] [discussing cases];
 
 Common Cause
 
 v.
 
 Board of Supervisors
 
 (1989) 49 Cal.3d 432, 440 [261 Cal.Rptr. 574,
 
 777
 
 P.2d 610].) Farm Sanctuary argues that a “public interest” exception should also apply in declaratory relief actions. We need not reach that question. In this case, it is sufficient that (1) Farm
 
 *505
 
 Sanctuary has a particular interest in protecting animals from inhumane treatment, (2) the litigation involves an issue of public concern, (3) any delay in resolving the dispute could result in the needless suffering of animals, contrary to the HSL, and (4) the ritualistic slaughter regulation would be insulated from judicial review if Farm Sanctuary were not permitted to challenge it.
 

 [8]
 

 The Confucian exemption now appears in the department’s regulations governing the postmortem treatment of poultry carcasses (§ 1247, subd. (e), Cal. Reg. Notice Register 98, No. 2 (Jan. 9, 1998)).
 

 [9]
 

 The HSL mandates that the department’s regulations “conform as far as possible to the regulations of the United States Department of Agriculture governing methods of slaughtering.” (Food & Agr. Code, § 19502; see 9 C.F.R. § 381.11 (1997) [authorizing exemption under Poultry Products Inspection Act (21 U.S.C. § 451 et seq.) where processing of poultry in accordance with religious dietary customs conflicts with the act or its implementing regulations].)
 

 *
 

 Judge of the Municipal Court for the Long Beach Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.